## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITY OF JERSEY CITY *et al.*,           :
                                        :
                    Plaintiffs,         :
                                        :
          v.                            :
                                        :
CONSOLIDATED RAIL                       :
CORPORATION,                            :        Civil Action No.:    09-1900
                                        :
                    Defendant,          :        Re Document Nos.:  14, 39
                                        :
          and                           :
                                        :
212 MARIN BOULEVARD, LLC *et al.*,      :
                                        :
                    Intervenor-Defendants.   :

## MEMORANDUM OPINION

**DENYING THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT;
GRANTING THE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

The plaintiffs in this action are the municipality of Jersey City, New Jersey and two non-profit organizations, the Rails to Trails Conservancy ("the RTC") and the Pennsylvania Railroad Harismus Stem Embankment Preservation Coalition ("the Coalition").  The plaintiffs initiated this action against the Consolidated Rail Corporation ("Conrail"), which has purportedly sold a portion of abandoned rail property located in Jersey City to a consortium of real estate developers ("the LLCs"), who have intervened as defendants in this action.  The plaintiffs assert that Conrail was and is required to obtain approval from the Surface Transportation Board ("the STB") before abandoning the subject property and selling it to the LLCs, who plan to develop the property for non-rail uses.

The matter is now before the court on the parties' cross-motions for summary judgment. The plaintiffs contend that the property at issue constitutes a "line of railroad" falling within the STB's abandonment jurisdiction. The defendants maintain that the subject property is a "spur" or "side track" over which the STB does not have jurisdiction. Furthermore, the defendants assert that the plaintiffs lack standing to prosecute this action. Because the plaintiffs have not supplied sufficient evidence of imminent injury to their concrete interests, the court concludes that the plaintiffs have not demonstrated that they have standing. Accordingly, the court denies the plaintiffs' motion for summary judgment and grants the defendants' cross-motion for summary judgment.

## II. BACKGROUND

### A. The Statutory Framework

Beginning in the late 1960s, "[a] rail transportation crisis seriously threatening the national welfare was precipitated when eight major railroads in the northeast and midwest region of the country entered reorganization proceedings under . . . the Bankruptcy Act." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 108 (1974). "Congress concluded that solution of the crisis required reorganization of the railroads, stripped of excess facilities, into a single, viable system operated by a private, for-profit corporation." *Id*. at 109.

To implement this solution, Congress enacted the Regional Rail Reorganization Act of 1973 ("the Rail Act"), 45 U.S.C. §§ 701 *et seq. Id.* The Rail Act created a government corporation, the United States Railway Association ("the USRA"), tasked with creating a Final System Plan ("FSP") for restructuring the railroads. 45 U.S.C. § 716(a)(1). The FSP, published by the USRA in July 1975, designated certain "rail lines" and "connecting spur and storage

tracks" held by the railroads in reorganization for transfer to a newly-formed private corporation, Conrail. *Consol. Rail Corp. v. Surface Transp. Bd.*, 571 F.3d 13, 15 (D.C. Cir. 2009).

The Rail Act also called for the creation of a Special Court, which would have exclusive jurisdiction over disputes relating to the FSP. 45 U.S.C. § 719. Following Congress's approval of the FSP, the Special Court issued conveyance orders, directing the trustee of each railroad in reorganization to convey all right, title and interest in the designated rail properties to Conrail. *Id.* § 743(b)(1). The Special Court was given "original and exclusive jurisdiction . . . [over] any action, whether filed by any interested person or initiated by the special court itself, to interpret, alter, amend, modify, or implement any of the orders entered by such court pursuant to section 743(b)."[1] *Id.* § 719(e)(2).

## B. The Property At Issue

Among the rail property that the USRA designated for transfer to Conrail was the "Harismus Branch," a property that the FSP described as running from "Milepost 1" in Jersey City to "Milepost 7" in Harrison, New Jersey. Defs.' Cross-Mot. for Summ. J. & Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Cross-Mot.") at 6; Decl. of Victor Hand ("Hand Decl."), Ex. A at 272; *see also* Pls.' Mot. for Summ. J. ("Pls.' Mot.") at 1. The Harismus Branch encompasses the Sixth Street Embankment ("the Embankment"), a series of elevated structures made of earth-filled stone retaining walls connected by bridges and spanning 1.3 miles near the Jersey City waterfront. Pls.' Mot. at 2 & Ex. E (Aff. of John Curley ("Curley Aff."))[2] ¶ 2. Constructed in

---

[1]    In 1997, Congress transferred the exclusive jurisdiction of the Special Court to the United States District Court for the District of Columbia. *See Niagara Mohawk Power Corp. v. Consol. Rail Corp.*, 97 F. Supp. 2d 454, 456 (S.D.N.Y. 2000) (citing 45 U.S.C. § 719(b)(2)).

[2]    Curley served as Jersey City's special counsel in litigation regarding the ownership and use of the Embankment properties. Curley Aff. ¶ 2.

the early 1900s, the Embankment is listed on the New Jersey Register of Historic Places and lies between two National Historic Districts.  *Id.* ¶ 3.

Conrail acquired the Harismus Branch in March 1976 pursuant to a conveyance order of the Special Court.  Pls.' Mot. at 2.  Conrail states that by the mid-1980s, it had sold off nearly ninety percent of the Harismus Branch in a half dozen different transactions to several developers, including the Jersey City Redevelopment Agency ("JCRA").[3]  Conrail's Cross-Mot. at 9 & Decl. of Robert Ryan ("Ryan Decl.")[4] ¶¶ 6-7.

By the 1990s, all that remained of the Harismus Branch properties was the Embankment.  Ryan Decl. ¶ 7.  Conrail states that it first negotiated to sell the Embankment to Jersey City, *id.* ¶ 7, and that in 1999, it was in active negotiations with the JCRA for the sale of the property, *id.* ¶ 32.  Those negotiations ceased when, over Jersey City's objection, a group of citizens successfully petitioned to have the Embankment listed on the State Register of Historic Places.  *Id.* ¶ 33.  This designation precluded Jersey City from implementing its development plans.  *Id.*

In December 2001 and October 2002, Conrail distributed bid solicitation packages to parties they believed to be potentially interested in acquiring the Embankment.  *Id.*  The JCRA was one of the recipients of these bid solicitation packages and transmitted Conrail's October 2002 request for bids to Jersey City's Department of Housing, Economic Development and Commerce.  *Id.* ¶ 34.  Neither the JCRA nor Jersey City submitted a bid for the property.  *Id.*  Indeed, the only bid for the property came from a group of LLCs interested in developing the property for private uses.  *Id.* ¶ 36.

---

[3]      The JCRA is an instrumentality of the Jersey City government empowered to facilitate the redevelopment of areas within the municipality in need of rehabilitation.  *See* N.J. STAT. ANN. §§ 40A:12A-11, 15.

[4]      Ryan is an independent consultant retained by Conrail.  Ryan Decl. ¶¶ 3-4.

In January 2003, the City Council of Jersey City enacted an ordinance designating the Embankment as an "historic landmark" under municipal law. *Id.* ¶ 35. Subsequently, in October 2003, Conrail received a letter from then-Mayor Glenn Cunningham, who stated that he "would like to open up a dialogue with Conrail as well as the Embankment Preservation Coalition regarding the maintenance of the integrity of the remaining embankment." *Id.* ¶ 36 & Ex. G. By that time, however, Conrail had entered into a contract with the LLCs for the sale of the Embankment. *Id.* ¶ 36.

The municipality advised Conrail of its view that Conrail's sale to the LLCs was void because the Embankment constituted a federally regulated line of rail that could not be abandoned without prior approval from the STB.[5] Curley Aff. ¶ 5. For the same reason, although the City Council had authorized Jersey City to condemn the property, the municipality concluded that it could not use state eminent domain law to acquire the property because its state eminent domain laws were preempted by federal jurisdiction over the property. Pls.' Mot., Ex. C-2 (Decl. of Mayor Jeremiah Healy ("Healy Decl.")) ¶ 4; Curley Aff. ¶ 5. Conrail responded that it did not believe its sale to the LLCs required STB approval because the Embankment constituted a "spur" or "side track" falling outside the STB's jurisdiction. Curley Aff. ¶ 6. Conrail finalized the sale of the property to the LLCs in July 2005. Ryan Decl. ¶ 41.

---

[5]    The STB is the successor to the Interstate Commerce Commission ("ICC") and "has 'exclusive' jurisdiction to regulate 'transportation by rail carriers' between places in the United States.'" *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 130 S. Ct. 2433, 2441 (2010).

## C. Prior Proceedings

In January 2006, a group of petitioners, including Jersey City, the RTC[6] and the Coalition,[7] commenced an administrative proceeding before the STB seeking a declaration that the Embankment fell within the STB's abandonment authority. Pls.' Mot. at 3. A rail carrier must obtain authorization from the STB to "abandon any part of its railroad lines" or discontinue the operation of all rail transportation over any part of its railroad lines." 49 U.S.C. § 10903(a)(1). No authorization is required, however, for the abandonment of "spur, industrial, team, switching, or side tracks." *Id.* § 10906.

In an August 2007 ruling, the STB concluded that "the Embankment property sold to [the LLCs] remains part of the national rail system subject to the Board's exclusive jurisdiction until appropriate abandonment authority is obtained." Pls.' Mot., Ex. A. Conrail and the LLCs appealed the STB's determination to this Circuit, which vacated the STB's ruling on jurisdictional grounds. *See Consol. Rail Corp.*, 571 F.3d at 14. The Circuit concluded that the STB's determination necessarily arose from its interpretation of the FSP and conveyance order that transferred the Embankment to Conrail. *Id.* at 19 (observing that "[t]he issue . . . is the 'nature' of the conveyance, that is as a line of railroad or as spur and yard track"). Because matters related to the interpretation of conveyance orders and the FSP fall within the exclusive jurisdiction of the District Court for the District of Columbia, as successor to the Special Court,

---

[6]     The RTC is a District of Columbia non-profit corporation dedicated to preserving otherwise-to-be abandoned railroad corridors for alternative and future public uses, including possible future rail reactivation and interim use as trail. Compl. ¶ 6. Approximately 2,200 RTC members live in New Jersey and another 5,500 live in neighboring New York. *Id.*

[7]     The Coalition is a New Jersey non-profit corporation made up of individual members and affiliated organizations, including neighborhood associations, "dedicated to preserving the historic Sixth Street Embankment." Compl. ¶ 7.

the Circuit concluded that the STB was without jurisdiction to consider the petitioners' request for declaratory relief.  *Id.*

Subsequently, in October 2009, Jersey City, the RTC and the Coalition commenced this action seeking a declaration that the Embankment is subject to the STB's abandonment jurisdiction.  *See generally* Compl.  The plaintiffs moved for summary judgment in November 2009, and Conrail filed its cross-motion for summary judgment in March 2010.

In May 2010, the court granted the LLCs leave to intervene in this action.[8]  *See* Minute Entry (May 10, 2010).  The LLCs joined in Conrail's cross-motion for summary judgment.  *See* Notice (May 10, 2010).  The STB has not sought to intervene in this action.

In the plaintiffs' motion for summary judgment, the plaintiffs argue that the property at issue constitutes a "line of railroad" for purposes of STB abandonment jurisdiction.[9]  *See*  Pls.' Mot. at 44.  The defendants oppose the plaintiffs' motion for summary judgment and have filed a cross-motion for summary judgment, in which they argue, *inter alia*, that the plaintiffs lack standing.  *See* Defs.' Cross-Mot.  In June 2010, the plaintiffs filed their opposition to the defendants' cross-motion and reply in support of their motion for summary judgment.  *See generally* Pls.' Opp'n to Defs.' Cross-Mot. & Reply ("Pls.' Opp'n").  Conrail and the LLCs filed

---

[8]     The court also granted the State of New Jersey leave to intervene for the limited purpose of defending the constitutionality of a New Jersey statute that the plaintiffs rely on to support their standing arguments and the defendants claim is preempted by federal law.  *See* Minute Entry (May 10, 2010); *see also infra* Part III.B.2.  As discussed below, however, the court does not reach the constitutionality of the New Jersey statute.  *See infra* Part III.B.2.

[9]     The plaintiffs also seek a declaration "that STB may appropriately determine that the Harismus Branch . . . is a line of railroad for purposes of STB abandonment jurisdiction."  Pls.' Mot. at 44.  This relief, however, has been conclusively foreclosed by the Circuit's prior ruling, which held that the STB lacks jurisdiction to determine whether that property falls within the STB's abandonment jurisdiction.  *See generally Consol. Rail Corp. v. Surface Transp. Bd.*, 571 F.3d 13 (D.C. Cir. 2009).

separate replies in support of their cross motion in July 2010.  *See generally* Conrail's Reply;

LLCs' Reply.

With the parties' cross-motions ripe for adjudication, the court turns to the applicable

legal standards and the parties' arguments.  Because standing is a threshold issue, *see Nat'l Org.*

*for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994); *Raytheon Co. v. Ashborn Agencies, Ltd.*,

372 F.3d 451, 453 (D.C. Cir. 2004), the court begins by analyzing the defendants' arguments that

the plaintiffs have not established their standing to pursue this action.


## III.  ANALYSIS

### A. Legal Standard for Standing

Article III of the Constitution limits the jurisdiction of federal courts to cases or

controversies.  U.S. CONST. art. III, § 2, cl. 1.  These prerequisites reflect the "common

understanding of what it takes to make a justiciable case."  *Steel Co. v. Citizens for a Better*

*Env't*, 523 U.S. 83, 102 (1998).  Consequently, "a showing of standing 'is an essential and

unchanging' predicate to any exercise of a court's jurisdiction."  *Fla. Audubon Soc'y v. Bentsen*,

94 F.3d 658, 663 (D.C. Cir. 1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

(1992)).

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing

standing.  *Lujan*, 504 U.S. at 561; *Steel Co.*, 523 U.S. at 104; *City of Waukesha v. Envtl. Prot.*

*Agency*, 320 F.3d 228, 233 (D.C. Cir. 2003) (per curiam).  The extent of the plaintiff's burden

varies according to the procedural posture of the case.  *Sierra Club v. Envtl. Prot. Agency*, 292

F.3d 895, 898-99 (D.C. Cir. 2002).  At the pleading stage, general factual allegations of injury

resulting from the defendant's conduct will suffice.  *Id.*  On a motion for summary judgment,

however, the "plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true." *Id.* at 899 (citing FED. R. CIV. P. 56) (internal quotation marks omitted); *accord Fla. Audubon*, 94 F.3d at 666.

To demonstrate standing, a plaintiff must satisfy a three-pronged test. *Sierra Club*, 292 F.3d at 898 (citing *Lujan*, 504 U.S. at 560). First, the plaintiff must have suffered an injury in fact, defined as a harm that is concrete and actual or imminent, not conjectural or hypothetical. *Byrd v. Envtl. Prot. Agency*, 174 F.3d 239, 243 (D.C. Cir. 1999) (citing *Steel Co.*, 523 U.S. at 103). Second, the injury must be fairly traceable to the conduct alleged. *Id.* Finally, it must be likely that the requested relief will redress the alleged injury. *Id.* This Circuit has made clear that no standing exists if the plaintiff's allegations are "purely speculative [which is] the ultimate label for injuries too implausible to support standing." *Tozzi v. Dep't of Health & Human Servs.*, 271 F.3d 301, 307 (D.C. Cir. 2001) (citing *Advanced Mgmt. Tech. Inc. v. Fed. Aviation Admin.*, 211 F.3d 633, 637 (D.C. Cir. 2000)). Nor does standing exist where the court "would have to accept a number of very speculative inferences and assumptions in any endeavor to connect [the] alleged injury with [the challenged conduct]." *Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980).

An organizational plaintiff possesses standing so long as "its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires members' participation in the lawsuit." *Consumer Fed'n of Am. v. Fed. Commc'ns Comm'n*, 348 F.3d 1009, 1011 (D.C. Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

## B. Jersey City Lacks Standing

The defendants contend that Jersey City lacks standing because it has failed to show any actual or imminent injury by virtue of the defendants' actions. Defs.' Cross-Mot. at 30-39. As noted by the defendants, Jersey City's interest in the property (and, consequently, in this litigation) stems from its desire "to acquire the property for rail use (including expansion of the light rail system to Journal Square and/or, with additional properties, to the rail and passenger hub at Secaucus), for historic preservation, for trail use, for open space use, and for a combination of these uses." *Id.* at 31 (quoting Curly Aff. ¶ 3); *see also* Pls.' Opp'n at 3 & Ex. L (Decl. of Robert Cotter ("Cotter Decl."))[10] ¶¶ 3-6; Healy Decl. ¶¶ 5-6. This interest, the defendants argue, is in no way dependent on the plaintiffs' success in this action. Defs.' Cross-Mot. at 33. To the contrary, the defendants contend that "if [it] is correct that the property is not a line of railroad subject to the STB's jurisdiction, the City could condemn the property without further ado." *Id.* The defendants assert that Jersey City "has offered no evidence that Conrail's actions have increased the risk that the City will not be able to exercise eminent domain to acquire the property." *Id.* at 34.

The defendants argue as well that Jersey City's purported injury is too speculative because it is based solely on the frustration of plans that it might or might not pursue in the future. *Id.* According to the defendants, Jersey City has not put forward any concrete plan to acquire and develop the property. *Id.* The defendants further argue that any injury suffered by Jersey City is "self-inflicted" because the municipality was offered an opportunity to purchase the property but chose not to do so. *Id.* at 34-35. Finally, the defendants contend that Jersey

---

[10]     Robert Cotter is Jersey City's Planning Director. Cotter Decl. ¶ 1.

City's inability to avail itself of state and federal remedies available in STB abandonment proceedings does not constitute an injury-in-fact.[11]  *Id.* at 35-39.

The plaintiffs respond that Conrail's failure to obtain abandonment authority from the STB has hampered Jersey City's efforts to acquire and develop the property for public use.  Pls.' Opp'n at 3-28.  They argue that under state and federal law, Jersey City cannot condemn the property unless Conrail first obtains abandonment approval from the STB.  *Id.* at 3-9.  The only way to resolve whether the STB's abandonment authority extends to the property, the plaintiffs argue, is through this proceeding.  *Id.* at 8-9.  The plaintiffs also contend that these injuries are concrete and imminent, as evidenced by the fact that the LLCs began to tear out stanchions associated with the Embankment before ultimately agreeing to discontinue any acts of deconstruction until the resolution of the STB proceedings.  *Id.* at 9-10.  Furthermore, the plaintiffs contend that the defendants' "evasion" of the STB's abandonment authority has foreclosed Jersey City and the other plaintiffs from pursuing federal and state remedies available in STB abandonment proceedings.  *Id.* at 10-19.

Of the three elements of constitutional standing, the first – the injury-in-fact requirement – has been described as the most critical.  *See Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 704 (D.C. Cir. 1988) (observing that the injury-in-fact requirement "is the core of standing" (citing *Daughtrey v. Carter*, 584 F.2d 1050, 1056 (D.C. Cir. 1978))).  Requiring imminent and concrete injury, together with the other elements of standing, ensures that the plaintiff possesses "a personal stake in the outcome of the controversy," as necessary to satisfy Article III's case-or-controversy requirement.  *Larson v. Valente*, 456 U.S. 228, 238 (1982) (quoting *Duke Power Co. v. Carolina Envtl. Study Grp.*, 438 U.S. 59, 72 (1978)); *see also Lance v. Coffman*, 549 U.S. 437,

---

[11]      The defendants also argue that Jersey City lacks standing because it has failed to establish the redressability of its injuries.  Defs.' Cross-Mot. at 39-41.  Because the court concludes that Jersey City has not demonstrated injury-in-fact, the court does not reach this argument.

439 (2007) (observing that Article III's case-or-controversy requirement demands that the plaintiff seek relief that "tangibly benefits him" (quoting *Lujan*, 504 U.S. at 573-74)).

The plaintiffs have put forward a number of arguments regarding how Jersey City will be injured if the defendants are permitted to evade STB jurisdiction. Pls.' Opp'n at 3-28. The court considers these asserted injuries in turn.

### 1. Acquisition of the Property Through Condemnation

First and foremost, the plaintiffs contend that Jersey City has been injured by the defendants' efforts to "evade" STB jurisdiction thus far, as they have "prevent[ed] [Jersey City] from lawfully exercising its legally protected right to condemn the line for public purposes." Pls.' Opp'n at 3. The plaintiffs' argument rests on the premise that "the City lawfully can neither voluntarily purchase nor condemn the property absent abandonment authorization." *Id.* at 4. As a result, the plaintiffs argue, the defendants' foregoing of the STB abandonment process is causing continuing injury to Jersey City by preventing it from condemning the property.

It is well-settled that a municipality cannot condemn rail property subject to the STB's abandonment authority without STB approval. *See City of Lincoln v. Surface Transp. Bd.*, 414 F.3d 858, 862 (8th Cir. 2005) (citing 49 U.S.C. § 10501(b)); *Kan. City Area Transp. Auth. of the Kan. City Transp. Dist. v. Ashley*, 555 S.W.2d 9, 10-11 (Mo. 1977). So long as a property is subject to the STB's jurisdiction, state eminent domain law is preempted by federal law regulating rail transportation. *See City of Lincoln*, 414 F.3d at 862.

It is, however, equally clear that STB abandonment approval poses an obstacle to condemnation only if the property falls within the STB's jurisdiction. *See* 49 U.S.C. § 10906 (providing that the STB "does not have authority . . . over construction, acquisition, operation, abandonment or discontinuance of spur, industrial, team, switching, or side tracks"); *cf.*

*Nicholson v. Interstate Commerce Comm'n*, 711 F.2d 364, 366 (D.C. Cir. 1983) (holding that a railroad did not require the ICC's approval to build a rail yard because the yard was not a "line of railroad" and therefore fell outside the ICC's jurisdiction). The plaintiffs expressly acknowledge that "[i]f this Court determines . . . that the property is somehow not subject to ICC (now STB) jurisdiction by reason of the Special Court's conveyancing order, then [Jersey] City can immediately exercise state law eminent domain remedies over the property." Pls.' Opp'n at 8.

Yet, despite Jersey City's interest in condemning the property, it is the plaintiffs (and not the defendants or the STB)[12] who are seeking a declaration that the property falls within the STB's abandonment jurisdiction. *See generally* Compl. As noted, the defendants maintain that because the property does not constitute a "line of railroad," the STB does not have jurisdiction and STB approval is not required for Jersey City to condemn the property. Defs.' Cross-Mot. at 33. Thus, if the *defendants* prevail in this litigation, Jersey City will be able to immediately commence condemnation proceedings to acquire the property. Pls.' Opp'n at 8. Indeed, the plaintiffs state that "[c]larification that the Embankment portion of the Branch *is not subject to STB jurisdiction is thus imperative for the City* not only to acquire the line either voluntarily or by eminent domain but also to obtain good title to the property." *Id.* at 5 (emphasis added). This position is, of course, at odds with the plaintiffs' substantive position that the property is subject to STB jurisdiction. *See generally* Compl.

The plaintiffs argue that judicial intervention will nonetheless benefit Jersey City by providing clarity as to whether abandonment approval is required, likening this action to an

---

[12] The STB has declined to intervene in these proceedings, despite the fact that it is plainly aware of this action, as it was a party to the proceedings before the Circuit. *See generally Consol. Rail Corp. v. Surface Transp. Bd.*, 571 F.3d 13 (D.C. Cir. 2009). It has held in abeyance the administrative abandonment proceedings concerning this property pending the outcome of this litigation. *See generally Consol. Rail Corp. – Abandonment Exemption – in Hudson County, N.J.*, STB Docket No. AB-167, 2010 WL 1558981 (Apr. 19, 2010).

"adverse abandonment" proceeding before the STB.  Pls.' Opp'n at 5-7.  This analogy, however,

merely underscores the fact that state law condemnation remedies do not provide Jersey City a

sufficient stake in the outcome of this litigation.  Whereas in a typical abandonment case, a

railroad requests STB authorization to discontinue service over a particular line, an "adverse

abandonment" proceeding involves a request by a third party, over the railroad's objection, for

an abandonment certificate from the STB.  *Consol. Rail Corp. v. Interstate Commerce Comm'n*,

29 F.3d 706, 708 (D.C. Cir. 1994); *see also* 49 U.S.C. § 10903(a)(1) (providing that any

interested party may initiate an abandonment proceeding).  "Generally, a third party seeks

abandonment because it wants the rail line condemned; an abandonment certificate can be used

in state court to establish that the line is not required for rail service in interstate commerce and

therefore is not exempt from local or state condemnation."  *Consol. Rail Corp.*, 29 F.3d at 708-

09.

        The tangible benefit to the third party in an "adverse abandonment" proceeding is clear; if

the third party succeeds, the cloud of STB jurisdiction (and federal preemption of state

condemnation law regarding rail property) is lifted and the third party can avail itself of state law

remedies to seize a property.  *Id.*  In this case, by contrast, the plaintiffs are seeking to prolong,

rather than lift, STB jurisdiction over the property.  *See generally* Compl.  Thus, the plaintiffs are

advocating for the federal preemption of the very state eminent domain laws that Jersey City

intends to rely on to acquire the property.  Under these circumstances, Jersey City cannot base its

standing on its inability to utilize these state eminent domain remedies.

        The plaintiffs' effort to analogize this case to a declaratory judgment proceeding is

similarly unpersuasive.  *See* Pls.' Opp'n at 5.  Even in a declaratory judgment action, the plaintiff

must have a concrete interest in the outcome of the litigation to have standing.  *See, e.g.*, *Borg-*

*Warner Protective Servs. Corp. v. Equal Emp't Opportunity Comm'n*, 245 F.3d 831, 834 (D.C. Cir. 2001) (holding that an employer lacked standing to seek a declaratory judgment affirming the enforceability of its arbitration agreements because "if the district court were to grant the relief [the employer] seeks in this case the company would gain nothing" as the Circuit had already held such agreements enforceable); *see also Hosein v. Gonzales*, 452 F.3d 401, 404 (5th Cir. 2006) (holding that the plaintiff lacked standing to seek a declaratory judgment backdating her naturalization date because she sought "a remedy for a problem that, as to her, does not exist" as "she was granted citizenship, and she claims no personal damages, *e.g.*, the denial of some individual benefit of citizenship" stemming from the government's action); *Perry v. Sheahan*, 222 F.3d 309, 313-14 (7th Cir. 2000) (holding that the plaintiff lacked standing to seek declaratory and injunctive relief prohibiting the seizure of firearms during evictions because those remedies addressed future seizures that would not redress his ongoing injury, such that he "lack[ed] the personal stake in the outcome that provides standing"). As in these cases, judicial intervention will not benefit Jersey City in its efforts to condemn the property because the position it advocates, if adopted by the court, would result in the preemption of those state law remedies.

In sum, the plaintiffs have not established that judicial intervention here would tangibly benefit Jersey City in its efforts to acquire the property through condemnation. Accordingly, the court concludes that Jersey City's purported inability to avail itself of state condemnation laws cannot establish its standing in this case.

### 2. The Right of First Refusal Under New Jersey Statute

The plaintiffs contend that the defendants' actions have deprived Jersey City of its remedies under N.J. Stat. Ann. § 48:12-125.1 ("the New Jersey Statute"), which requires a

railroad to offer rail property approved for abandonment by the STB to state and local governments for ninety days before selling it to private entities. Pls.' Opp'n at 21. According to the plaintiffs, the statute "provides powerful remedies favorable to City, RTC and Coalition, but only if the Harismus Branch is subject to STB abandonment authority." *Id.* at 22.

The defendants assert that the plaintiffs' reliance on the New Jersey Statute is misplaced for a number of reasons. Defs.' Cross-Mot. at 36-39. They argue that the plaintiffs have not established that the New Jersey Statute provides Jersey City any remedies it does not currently possess under state condemnation law. *Id.* at 39; Conrail's Reply at 19. Furthermore, Conrail maintains that it did, in fact, offer the property for sale to Jersey City before selling it to the LLCs. Defs.' Cross-Mot. at 38; Conrail's Reply at 20. The defendants also contend that the New Jersey Statute cannot serve as a basis for standing because it is preempted by federal law. Defs.' Cross-Mot. at 37-38; Conrail's Reply at 20-24; LLCs' Reply at 6-13.

> At the time of the events at issue, the New Jersey Statute provided that

> any railroad company which makes application to the [STB] for authority to abandon any part of its right of way on which passenger or freight services are operated . . . shall, within 10 days of making such application, serve notice thereof upon the State and upon each county and municipality in which any part of the right of way proposed for abandonment is located. No sale or conveyance of any part of such right of way shall thereafter be made to any person other than the State, a county or municipality for a period of 90 days from the date of approval by the [STB] of the application for abandonment . . . unless prior thereto each governmental agency entitled to such notice shall have filed with the railroad company written disclaimer of interest in acquiring all or any part of said right of way. Any sale or conveyance made in violation of this action shall be void.

N.J. STAT. ANN. § 48:12-125.1 (amended Jan. 18, 2010).[13]

---

[13]     Effective January 18, 2010, the New Jersey Statute was amended to add requirements that the railroad negotiate in good faith during the ninety-day period and that after the ninety-day period, any sale of rail property to any non-governmental entity was subject to a right of first refusal for the same price by a governmental entity. *See* N.J. STAT. ANN. § 48:12-125.1. The plaintiffs have presented no argument that these provisions apply retroactively to Conrail's sale of the property to the LLCs. *See generally* Pls.' Mot.; Pls.' Opp'n.

According to the plaintiffs, Jersey City would benefit from application of the New Jersey Statute because it would "afford[] the City a protected 90 day period in which to decide whether it wished to acquire the property." Curley Decl. ¶ 7. Yet it is undisputed that Jersey City was, in fact, notified of Conrail's intent to sell the property before Conrail entered into a contract with the LLCs, but declined to act on that opportunity to acquire the property. *See* Defs.' Cross-Mot. at 10-11 & Ryan Decl. ¶¶ 32-34. Indeed, in December 2001 and October 2002, Conrail sent bid solicitation packages to parties potentially interested in purchasing the property, including the JCRA. Ryan Decl. ¶ 33. The JCRA specifically forwarded the October 2002 bid solicitation letter to Jersey City's Department of Housing, Economic Development and Commerce in a memorandum dated October 28, 2002. *Id.* ¶ 34 & Ex. G. The memorandum, titled "6th Street Embankment (Conrail ROW)," stated as follows:

> [A]ttached for your information and perusal is the bid solicitation letter received from Conrail with regard to the above property. Minimum bid price is $3,000,000. I know the JCRA is not interested in bidding on this property. I presume that the City has no interest either at this point but felt you should see the attached.

*Id.*, Ex. G.

Neither the JCRA nor any other entity of the Jersey City government submitted a bid in response to the December 2001 or October 2002 bid solicitations. *Id.* ¶ 33. Indeed, the record indicates that the first time that Jersey City expressed any interest in purchasing the property was in October 2003, when then-Mayor Glenn Cunningham wrote to Conrail that he "would like to open up a dialogue with Conrail as well as the Embankment Preservation Coalition regarding the maintenance of the integrity of the remaining embankment." *Id.* ¶ 36 & Ex. G. Accordingly, Jersey City was expressly notified that the property was for sale and was given an opportunity to

decide whether to acquire it, precisely the opportunity it claims it was denied under the New Jersey Statute.

Moreover, the plaintiffs have not adequately explained why the application of the New Jersey Statute would leave them in any better position than they are in today. The application of the New Jersey Statute would void the sale between Conrail and the LLCs and afford Jersey City an opportunity to purchase the property from Conrail. *See* N.J. STAT. ANN. § 48:12-125.1 (amended Jan. 18, 2010). Yet, as discussed above, the plaintiffs have not explained how the defendants' actions prevent Jersey City from acquiring the property now through condemnation. *See supra* Part III.B.1. Condemnation would nullify Conrail's sale of the property to the LLCs and permit Jersey City to acquire the property for just compensation. *See Twp. of W. Orange v. 769 Assocs., LLC*, 969 A.2d 1080, 1085 (N.J. 2009) (citing N.J. CONST. art. I, ¶ 20). The plaintiffs have offered nothing to indicate that this currently available remedy differs in any meaningful way from the remedy they would have had under the New Jersey Statute. *See* Pls.' Opp'n at 21-27; *see also Wertheimer v. Fed. Election Comm'n*, 268 F.3d 1070, 1074-75 (D.C. Cir. 2001) (holding that the plaintiff lacked standing because he failed to show that the ruling sought would yield any meaningful relief to which he was not already entitled). Accordingly, the plaintiffs have failed to explain how Jersey City has been injured by its inability to avail itself of the New Jersey Statute.

The plaintiffs contend that Jersey City is not required to demonstrate that application of the New Jersey Statute would result in any tangible benefit to Jersey City. Pls.' Opp'n at 27. In support of this contention, the plaintiffs rely on "procedural rights" cases, which provide that "a person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504

U.S. at 572 n.7.  When a plaintiff asserts a "procedural injury," "the case law relieves the plaintiff of the need to demonstrate that (1) the agency action would have been different but for the procedural violation, and (2) that court-ordered compliance with the procedure would alter the final result."  *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005); *see also Lemon v. Geren*, 514 F.3d 1312, 1314-15 (D.C. Cir. 2008) (holding that the plaintiffs had standing to challenge the military's purported failure to conduct the required environmental impact analysis in connection with its disposition of a military base, despite the fact that there was no guarantee that the impact analysis would lead to a different outcome).

The plaintiffs' reliance on these "procedural rights" cases, however, is misplaced for at least two reasons.  First, this Circuit has held that lower standards of redressability and immediacy apply only when a plaintiff is challenging a government agency's procedural failure. *St. John's United Church of Christ v. Fed. Aviation Admin.*, 520 F.3d 460, 463 (D.C. Cir. 2008) (holding that the petitioners were required to "satisfy the normal standard for redressability" because the "procedural rights" rule articulated in *Lujan* "applies only when a party challenging an agency's procedural failure cannot 'establish with any certainty' that the *agency* would reach a different decision," and "the redressability obstacle the petitioners face[d] [was] uncertainty over what *Chicago* would do – not the FAA").  Because the plaintiffs in this case are challenging the conduct of a private entity rather than an agency, they are required to satisfy the normal standards of redressability.

Moreover, the lower threshold for redressability and immediacy in "procedural rights" cases does not alleviate the plaintiff's burden of demonstrating an actual injury.  *See Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1151 (2009) (observing that "deprivation of a procedural right without some concrete interest that is affected by the deprivation – a procedural right *in*

*vacuo* – is insufficient to create Article III standing"); *St. Croix Chippewa Indians of Wis. v. Salazar*, 2010 WL 2767119, at *1 (D.C. Cir. July 6, 2010) (stating that "[t]o allege a cognizable procedural harm, plaintiffs must identify an injury that follows the violation of a procedural right, which was afforded to them by statute and designed to protect their threatened concrete interest"); *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009) (observing that "the omission of a procedural requirement does not, by itself, give a party standing to sue" and that "a procedural-rights plaintiff must show not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest" (citing *Fla. Audubon Soc'y*, 94 F.3d at 664-65)); *see also Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1159 (D.C. Cir. 2005) (holding that even if the plaintiffs suffered a procedural harm, they lacked standing because they "fail[ed] to demonstrate how they suffer[ed] actual injury to a concrete, particularized interest, caused by the challenged conduct").  While a procedural injury "can loosen the strictures of the redressability prong of our standing inquiry," the injury requirement "is a hard floor of Article III jurisdiction." *Summers*, 129 S. Ct. at 1151.

Thus, even under the "procedural rights" case law on which the plaintiffs rely, it is not enough, as the plaintiffs suggest, *see* Pls.' Opp'n at 29, for Jersey City to show simply that it was deprived of an opportunity to exercise its remedies under the New Jersey Statute.  Rather, the plaintiffs were required to demonstrate that Jersey City's inability to exercise its rights under the New Jersey Statute has injured the municipality in some concrete way.  *See Ctr. for Law & Educ.*, 396 F.3d at 1159.  The plaintiffs, however, have offered nothing to indicate that their remedies under the New Jersey Statute differ in any meaningful way from the remedies they now possess under state condemnation law, such that Jersey City's inability to avail itself of the New

Jersey Statute constitutes an injury. *See* Pls.' Opp'n at 21-27. Although the defendants have hardly established that Jersey City would *not* benefit from application of the New Jersey Statute, it is the plaintiffs' burden to establish the presence of an injury-in-fact, *see Wertheimer*, 268 F.3d at 1074-75, and it is not the court's place to speculate as to the presence of such an injury, *see Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) (stating that the court did not "express any opinion on whether the [petitioners] . . . could have provided evidence of their standing" because "[i]t suffice[d] to say that, when given an opportunity to do so, petitioners did not" provide such evidence). Accordingly, the plaintiffs have not demonstrated that the New Jersey Statute provides Jersey City standing in this case.[14]

### 3. Federal Remedies Available in STB Abandonment Proceedings

The plaintiffs also argue that Jersey City (as well as the RTC and the Coalition) would benefit from judicial intervention because they would be able to take advantage of federal remedies available in STB abandonment proceedings. Pls.' Opp'n at 10-19. Chief among these remedies is a federal statutory provision authorizing third parties to purchase rail property subject to abandonment proceedings through an "offer of financial assistance" ("OFA"). 49 U.S.C. § 10904. The Third Circuit has summarized the OFA process in the following manner:

> When a carrier has applied to abandon a rail line, "any person" may file an OFA, which is an offer to purchase or subsidize a rail line and so to facilitate continued freight rail service. When a timely OFA is filed and the STB finds that the offeror is "financially responsible," the STB must postpone abandonment authority pending completion of the OFA process.

> When an OFA is on the table, the offeror and the rail carrier are free to negotiate the terms of the putative transaction. If they fail to reach an agreement, either the offeror or the rail carrier, within thirty days of the OFA, may request that the STB set the conditions and amount of compensation for the transaction. Within thirty days of the request to establish conditions and compensation amount, the STB

---

[14]    Because the plaintiffs have not established that the New Jersey Statute provides Jersey City a basis for standing, the court does not reach the issue of whether the New Jersey Statute is preempted by federal law.

renders its decision. Once the STB sets the conditions and compensation, the railroad is bound to those terms, but the OFA proponent has ten days to withdraw the OFA before being bound to the STB's decision.

*Borough of Columbia v. Surface Transp. Bd.*, 342 F.3d 222, 226 (3d Cir. 2003) (internal citations omitted).

The plaintiffs contend that if the court concludes that the property falls within the STB's jurisdiction, the defendants will be required to obtain abandonment authority from the STB. Pls.' Opp'n at 11-12. Jersey City will then have the opportunity to submit an OFA to purchase the property for continued rail use. *Id.* The plaintiffs contend that "[t]he rights and remedies available to the City under the OFA process would likely prove extremely advantageous to plaintiffs' interests." *Id.* at 12.

The defendants argue that it is highly unlikely that Jersey City would obtain any relief through the OFA process because the municipality's interest is in developing light rail commuter service, whereas the OFA process is intended to assist third parties seeking to continue freight service over a piece of rail property. Defs.' Cross-Mot. at 35-36; Defs.' Reply at 14-15. The plaintiffs respond that nothing in the OFA statute or implementing regulations indicates that the OFA remedy may only be used for freight purposes and that at any rate, "the City's interest in relieving congestion is not limited to providing automobile drivers with a passenger rail alternative, but also encompasses use of rail for freight deliveries . . . in order to reduce reliance on trucks." Pls.' Opp'n at 12 (citing Healy Decl. ¶ 6).

Ultimately, the court need not resolve whether the mixed commuter-freight rail system referred to in the plaintiffs' papers would qualify for an OFA because the plaintiffs have offered no evidence that Jersey City would, in fact, submit an OFA if it were to succeed in this action. *See generally* Pls.' Opp'n. The Supreme Court has made clear that prospective injuries based on

the frustration of speculative intentions are not sufficiently concrete or imminent to satisfy the injury-in-fact requirement. *See Lujan*, 504 U.S. at 562 (holding that the plaintiffs' expression of their intent to return to an area allegedly under environmental threat "without any description of concrete plans, or indeed even any specification of *when* the some day [would] be [did] not support a finding of the 'actual or imminent' injury" required to establish standing); *see also Worth v. Jackson*, 451 F.3d 854, 858 (D.C. Cir. 2006) (concluding that the plaintiff lacked standing to challenge an employer's alleged preferential treatment of minorities because his "assertion that he 'intends to apply for new position and promotions at [the employer] on a regular basis in the future' is just the kind of speculative intention normally insufficient for standing purposes"); *Saga Broad. Corp. v. Fed. Comm'cns Comm'n*, 38 Fed. Appx. 8, 10 (D.C. Cir. 2002) (holding that the petitioner lacked standing to challenge a regulation establishing a "Class A lower power television license" because "[h]aving failed to assert even generally that he would, but for the challenged regulations, seek Class A status and additional channels, [the petitioner] has not shown that he suffers an actual or imminent injury"); *cf. Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977) (concluding that a developer had standing to challenge a zoning ordinance prohibiting a construction project, despite the fact that it was not completely certain that the developer would carry through with the construction, because the developer had a "detailed and specific" plan for the project); *Toll Bros. Inc. v. Twp. of Readington*, 555 F.3d 131, 140 (3d Cir. 2009) (holding that a real estate developer with an option to purchase property had standing to challenge a zoning ordinance because the ordinance thwarted its specific development plans).

Although the plaintiffs insist that Jersey City's intended uses of the property are consistent with the OFA statute, Pls.' Opp'n at 12, they have offered no evidence that the

municipality has any intention (much less a non-speculative intention) of submitting an OFA, *see generally id.* Although the plaintiffs state in their opposition to the defendants' cross-motion that they "seek to invoke" federal remedies available in STB proceedings, *id.* at 11, they make no specific representation that Jersey City intends to submit an OFA or that it has even explored this possibility in any meaningful way, *see id.* at 10-12; *see also* Pls.' Mot. at 16-17 (listing the remedies available without stating that Jersey City would submit an OFA if successful in this action). The declarations from the Jersey City officials do not mention the OFA process and provide no indication that the municipality has any specific intention of submitting such a proposal. *See generally* Healy Decl.; Curley Aff.; Cotter Decl.; *see also Sierra Club*, 292 F.3d at 899 (noting that at the summary judgment stage, the plaintiff must set forth by affidavit or other evidence specific facts establishing standing). The sole mention of the mixed freight-commuter rail system appears in the declaration of Mayor Healy, who states only that the municipality "wish[es] also to explore restored freight uses to relieve truck congestion." Healy Decl. ¶ 6. Indeed, the only avenues for acquisition specifically mentioned in the declarations submitted by the Jersey City officials are condemnation and negotiated purchase. *See generally* Healy Decl.; Curley Aff.; Cotter Decl. In the absence of any evidence that Jersey City intends to utilize the OFA statute, the inability to submit an OFA occasioned by the defendants' actions is not a sufficiently concrete and imminent harm to establish an Article III case-or-controversy.

The plaintiffs also contend that Jersey City has been deprived the benefit of the "public use condition" statute, codified at 49 U.S.C. § 10905, which authorizes the STB to bar any sale or transfer of rail property for 180 days after abandonment. Pls.' Opp'n at 13. The plaintiffs suggest that the STB could utilize this provision to provide time for Jersey City to institute condemnation proceedings on the property. *Id.* Yet, as previously discussed, the plaintiffs have

identified nothing that prevents Jersey City from instituting condemnation proceedings now, other than their own efforts to obtain a declaration that such condemnation proceedings would be preempted.  *See supra* Part III.B.1.  Accordingly, the public use condition statute does not support Jersey City's standing in this case.

Finally, the plaintiffs contend that Jersey City has been deprived the benefit of a number of additional statutory remedies available in STB proceedings: 49 U.S.C. § 10903(e), which authorizes the STB to impose conditions on its approval of abandonment as necessary for "public convenience and necessity"; the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 *et seq.*, which would require the STB to "take into account" adverse impacts on properties listed or eligible for listing on the National Register of Historic Places prior to the issuance of an abandonment license; and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, which requires a "hard look" at environmental consequences of federal actions.  Pls.' Opp'n at 14-19.  According to the plaintiffs, these provisions could lead the STB to impose conditions on its abandonment approval that would prohibit Conrail or the LLCs from demolishing the Embankment, or even lead the STB to withhold its abandonment approval altogether.  *Id.*

Yet, the plaintiffs do not explain how the imposition of abandonment conditions or the withholding of STB abandonment approval would help Jersey City acquire the property and develop it for public uses, the municipality's principal interest in this litigation.  *See generally* Pls.' Opp'n; *see also Role Models Am., Inc. v. Geren*, 514 F.3d 1308, 1311-12 (D.C. Cir. 2008) (holding that plaintiff lacked standing because the NHPA "does not protect [the plaintiff's] right to acquire property for its own use when the use is unrelated to the [NHPA's] purpose").  Furthermore, to the extent that Jersey City has an interest in preventing the demolition and

development of the Embankment, *see* Pls.' Opp'n at 27-28, an interest that might be furthered by the STB's consideration of the environmental and historical landmark impacts, any injury to that interest is not imminent because, as discussed below, there is no indication that the demolition and development of the Embankment will proceed anytime soon. *See infra* Part III.C. And, as noted, even a plaintiff claiming a "procedural" injury must demonstrate actual or imminent injury to a concrete interest to satisfy the requirements of constitutional standing. *See supra* Part III.B.3. Accordingly, the plaintiffs have not established that Jersey City's inability to avail itself of federal remedies available in STB abandonment proceedings provides the municipality standing to pursue this action.

### 4. The Rail Act

Finally, the plaintiffs contend that they have standing under the Rail Act. Pls.' Opp'n at 19-21. This rather opaque argument proceeds from the premise that for Conrail to succeed in this litigation, the court must conclude that "there was some secret USRA process by which historic lines conveyed to Conrail were somehow 'washed' of line status, or somehow otherwise authorized for abandonment at Conrail's discretion." *Id.* at 20. The Rail Act, however, required public notice of and opportunity for public comment on all abandonments under consideration by the USRA. *Id.* Accordingly, the plaintiffs argue that under the Rail Act, they "have standing to challenge any secret abandonment" of the rail property at issue. *Id.*

The defendants respond that there was nothing "secret" about the USRA's decision-making process, as the USRA published both a Preliminary and Final System Plan. Conrail's Reply at 18. The defendants also argue that if the USRA did secretly abandon the property, Jersey City could immediately invoke state law condemnation procedures to acquire the property, as that abandonment would have removed the property from federal jurisdiction. *Id.*

The parties agree that there is no evidence of any secret proceedings before the USRA. *See* Pls.' Opp'n at 30; Conrail's Reply at 18. Accordingly, there is no evidence that the plaintiffs were deprived their right to comment on any USRA designations. The Rail Act, therefore, does not provide the plaintiffs standing in this action.

## C. The RTC and the Coalition Lack Standing

The defendants assert that like Jersey City, the RTC and the Coalition do not have standing because they have not demonstrated the existence of an actual or imminent injury. Defs.' Mot. at 41-43. The defendants contend that these organizations cannot base their standing on their members' interest in preserving the Embankment and preventing development of the property because the demolition and development projects are far from imminent, given that municipal authorities have declined to issue the required permits and because the Jersey City Historic Preservation Commission has denied the LLCs' request to waive the historic status of the property. *Id.* at 41-42. Furthermore, the defendants argue that any interest possessed by the organizations' members in utilizing a future light rail system or park, as proposed by Jersey City, is too speculative to support standing. *Id.* at 42.

The plaintiffs maintain that RTC and the Coalition have standing in this case because they have an interest in preserving the property and preventing its development into high-rise condominiums, as proposed by the LLCs. Pls.' Opp'n at 10-19. They offer declarations from several of their members attesting to the negative impact that the demolition and development of the Embankment will have on them. *Id.*, Exs. C-4 (Joint Decl. of President and Coordinator of the Coalition ("Joint Decl.")), C-6 (Decl. of Coalition Member Dale Hardman ("Hardman Decl.")), C-7 (Decl. of Coalition Member Werner Bargsten ("Bargsten Decl."))). Relying on "procedural injury" case law, the plaintiffs contend that the organizations have standing because

they represent individuals living near the property whose interests will be harmed by the demolition and development of the Embankment. *Id.*

As discussed, even when a plaintiff is asserting a procedural injury, he or she must demonstrate the existence of an injury-in-fact to establish constitutional standing. *See supra* Part III.B.2; *Summers*, 129 S. Ct. at 1151. Where, as here, a plaintiff rests his or her standing on a prospective injury, the plaintiff must show that the injury is "imminent," rather than conjectural or hypothetical. *Sierra Club*, 292 F.3d at 898 (citing *Lujan*, 504 U.S. at 560). "Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes – that the injury is 'certainly impending.'" *Lujan*, 504 U.S. at 564 n.2 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

The plaintiffs have offered ample evidence that the interests of RTC and Coalition members would be impacted by the demolition and destruction of the Embankment. They have offered declarations from members living in the vicinity of the Embankment who indicate that demolition of the Embankment will exacerbate flooding problems in the area, increase pollution in the local waterways and reduce air quality. *See* Joint Decl. ¶¶ 4(k), (o)-(q); Hardman Decl. ¶ 6; Bargsten Decl. ¶¶ 3-7. These individuals further declare that demolition of the Embankment will destroy the historic and aesthetic value of the area, risk damage to the surrounding historic buildings, depress property values, harm local business interests and negatively impact quality of life. Joint Decl. ¶¶ 4(e), (j), (l)-(o); Bargsten Decl. ¶¶ 3-6. Were these injuries actual or imminent, there is little question that the RTC and the Coalition would have standing. *See, e.g.*, *Lemon*, 514 F.3d at 1314-15 (concluding that residents who lived near a military base had

standing because they lived "near where the federal action would occur and would feel the environmental effects of that action if it went forward").

The record, however, indicates that the demolition and development of the Embankment is hardly a foregone conclusion. The Jersey City municipal code provides that

> [n]o permit shall be issued or amended nor shall any construction, alteration, minor alteration, ordinary maintenance and repair or demolition be started on a landmark building nor on any sign, building, structure, object, site or landscape feature within a designed historic district, whether or not a construction permit is required, prior to a filing of an application for review by the Historic Preservation Commission or the issuance of either a Certificate of Appropriateness or a Certificate of No Effect.

JERSEY CITY MUN. CODE § 345-30A.

In January 2003, the municipality designated the Embankment an historic property. Ryan Decl. ¶ 33. The plaintiffs acknowledge that as a result of this designation, "City agencies (Historic Preservation Commission and Zoning Board of Adjustment) have declined to issue demolition and development permits" to the LLCs. Curly Aff. ¶ 18. Furthermore, on June 15, 2009, the Jersey City Historic Preservation Commission denied the LLCs' petition to waive the historic landmark status of the Embankment based on economic hardship. Defs.' Mot. at 41-42; Jenkins Decl. ¶ 7 & Ex. C. While it appears that the LLCs are seeking review of these rulings in New Jersey state court, *see* Curly Aff. ¶ 18, it cannot be said at this juncture that the demolition and development of the Embankment is "certainly impending."[15] *Lujan*, 504 U.S. at 564 n.2; *see also O'Shea v. Littleton*, 414 U.S. 488, 496-97 (1974) (concluding that the plaintiffs had not

---

[15]    To demonstrate the "concreteness" of their concerns about demolition, the plaintiffs assert that the LLCs "began tearing out stanchions associated with the Embankment" shortly after the plaintiffs filed a declaratory proceeding before the STB and only agreed to cease destruction of these fixtures after the plaintiffs sought an injunction. Pls.' Opp'n at 9-10. Although the plaintiffs contend that the destruction of these stanchions signals the grave risk of impending demolition, the plaintiffs do not dispute that municipal regulations prohibit the LLCs from proceeding with the demolition and development of the Embankment, the eventuality on which the RTC and the Coalition base their standing.

established an immediate threat of discriminatory enforcement of a criminal law where the most that could be said for plaintiffs' standing was "that *if* plaintiffs proceed to violate an unchallenged law and *if* they are charged, held to answer, and tried in any proceedings before petitioners, they will be subjected to the discriminatory practices that petitioners are alleged to have followed"). Accordingly, the court concludes that these potential injuries are not sufficiently imminent to support the standing of the RTC and the Coalition.

The RTC and the Coalition likewise cannot base their standing on their interest in the future utilization of the Embankment for light rail, open space or other public uses. As previously discussed, the plaintiffs have not explained why Jersey City's efforts to acquire and develop the property for such uses hinges on establishing the STB's jurisdiction over this case. *See supra* Part III.B.1. For the same reasons, the court concludes an interest in developing the space for public use does not provide RTC and the Coalition an adequate stake in the outcome of the litigation.

Accordingly, because the plaintiffs have not established that the RTC or the Coalition have an actual or imminent injury that would provide the RTC or the Coalition a stake in the outcome of this litigation, the court concludes that they do not have standing to pursue this action.

## IV. CONCLUSION

For the foregoing reasons, the court denies the plaintiffs' motion for summary judgment and grants the defendants' cross-motion for summary judgment. An Order consistent with this

Memorandum Opinion is separately and contemporaneously issued this 28th day of September,

2010.

RICARDO M. URBINA
United States District Judge